Christopher B. PROPERT, Appellant,

v.

DISTRICT OF COLUMBIA, a Municipal Corporation, et al., Appellees.

No. 90–7131.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 17, 1991.

Decided Nov. 19, 1991.

David P. Blackwood, with whom J. Gordon Forester, Jr., Washington, D.C., was on the brief, for appellant.

Mary L. Wilson, Atty., Office of Corp. Counsel, Washington, D.C., for appellee. John Payton, Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel and Rosalyn Calbert Groce, Asst. Corp. Counsel, Washington, D.C., were on the brief for appellee.

Before: EDWARDS and BUCKLEY, Circuit Judges, and PLAGER,* Circuit Judge, United States Court of Appeals for the Federal Circuit.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

On May 12, 1988, the District of Columbia ("D.C.") towed and destroyed appellant Christopher Propert's 1969 Volkswagen Karmann Ghia pursuant to its policy covering "junk" vehicles. Propert subsequently brought suit in the District Court against D.C. and James Stolburg, the officer from the Metropolitan Police Department ("MPD") who ordered his car towed. Propert's amended complaint sought, *inter alia*, a declaration that D.C.'s policy is unconstitutional and damages pursuant to 42 U.S.C. § 1983 (1988). Following a hearing on the parties' cross-motions for summary judgment, the District Court granted summary judgment to the defendants and dismissed the amended complaint, holding that Propert's due process rights were not violated. *See Propert v. District of Columbia*, 741 F.Supp. 961, 963 (D.D.C.1990).

We reverse the judgment of the District Court on the issue of liability and remand for consideration of an appropriate remedy. Because D.C.'s policy fails to provide either adequate notice or a hearing of any kind, we conclude that Propert's due process rights were violated by the towing and destruction of his car. Accordingly, we reinstate the complaint and remand with instructions that judgment be entered for Propert on the liability phase of his section 1983 claim against D.C.

## I. BACKGROUND

### A. *Facts*

The facts of this case are largely undisputed. In May 1988, Propert was the owner of a 1969 Volkswagen Karmann Ghia. The vehicle was parked on Seward Street in Southeast Washington, four doors away from Propert's residence, and was not blocking traffic or otherwise creating a safety hazard. The car was properly registered and displayed current license plates, a current inspection sticker and a valid parking permit.

On May 1, 1988, in response to a citizen complaint, Officer Stolburg went to the site where Propert's car was parked and inspected the car. Based on the car's physical appearance, Stolburg determined that it had been parked in the same spot for quite some time[1] and that it was "junk." In his deposition, Stolburg testified that the car was dirty and old, the roof appeared to be dry-rotted and one or two of the tires were flat. Stolburg admitted, however, that he knew of no official criteria for determining when a car is "junk." Stolburg, with refreshing candor, conceded that he had his own test for deciding when a car was covered by the "junk" vehicle policy: "[W]ould you take your mother to church in it is the kind of rule I use to determine if its saveable." Deposition of James Stolburg at 12,

---

* Sitting by designation pursuant to 28 U.S.C. § 291(a) (1988).

1. Propert concedes that the car had been parked in the same place for several weeks and was therefore in violation of local parking regulations, which forbid parking in the same spot on a public street for more than 72 hours. *See* D.C.Mun.Regs. tit. 18, § 2405.4 (1981).

*reprinted in* Appellant's Index ("A.I.") 234, 245.

Having unilaterally decided that Propert's car was junk, Stolburg attached a warning sticker to the windshield, which indicated that if the car was not moved within 72 hours it would be "disposed of as scrap." Officer Stolburg's name and a contact telephone number were written on the sticker; it was attached to the car with a strong adhesive backing.[2] Upon returning to his office, Stolburg entered the vehicle's tag number into a police computer in an attempt to ascertain the name of the owner. The officer could not recall, however, what happened with his computer search, except that he obtained no information; he stated that the computer might not have been working that day. Stolburg made no further attempts to determine the ownership of the vehicle.

On May 11, 1988, Stolburg returned to the site where Propert's car was parked and noticed that the warning sticker was no longer on the automobile. He put a new sticker on the car and made arrangements for it to be towed. The car was then towed and immediately destroyed the next day.

Propert claims that he never saw the warning stickers. He says he did not learn of his vehicle's imminent destruction until his girlfriend saw the sticker on May 12, the day the car was towed. By the time Propert reached Officer Stolburg by telephone, the car had been destroyed. Propert also contests Officer Stolburg's description of the condition of the vehicle; he admits that it had one flat tire but claims

that it was otherwise in good shape and had a value of $2500–$3000.

In authorizing the towing and destruction of Propert's car, Officer Stolburg acted pursuant to D.C.'s policy covering the disposition of abandoned and "junk" vehicles. Propert's amended complaint alleges that "[i]t was and is the policy, custom and practice of the District of Columbia" to provide no pre-towing notice other than by a warning sticker, no pre-towing opportunity for a hearing and no post-towing notice or opportunity for a hearing to owners of vehicles identified as "junk." *See* Amended Complaint ¶¶ 14–15, *reprinted in* A.I. 108, 111–12. D.C. admitted these allegations in its answer. *See* Answer of Defendants District of Columbia and James Stolburg to the Amended Complaint ¶¶ 14–15, *reprinted in* A.I. 175, 176. Thus, there is no dispute between the parties as to the existence or content of D.C.'s policy, nor does D.C. assert that the policy has been changed in any way since the time when Propert's car was towed.

D.C.'s policy is partially set forth in the municipal regulations, but also includes informal, non-codified elements. The regulations[3] define a vehicle as "abandoned" if: (1) it is parked in the same spot on a public street for 72 hours; (2) its owner "cannot be reasonably located;" and (3) it is not moved for another 72 hours after a warning sticker is attached. D.C.Mun.Regs. tit. 18, § 1105.1(a) (1987). A "junk" vehicle is an "abandoned" vehicle which is also "in wrecked, dismantled, or irreparable condition." *Id.* § 1105.1(b).[4] Abandoned and junk vehicles may be towed "as soon as

---

**2.** Normally such stickers can be removed only if scraped off with a sharp implement.

**3.** At the time Propert's car was destroyed, the relevant regulations were contained in D.C.Mun.Regs. tit. 18, §§ 1105.1 to 1105.6 (1987), as implemented by a Commissioner's Administrative Instruction dated September 21, 1973, and a Metropolitan Police Department General Order, Series 601, No. 1, dated November 30, 1981. *See* A.I. 118, 121, 130 (reprinting all three sources).

D.C. issued new regulations in 1989. *See* 36 D.C.Reg. 4575 (1989) (*reprinted in* A.I. 167), *codified at* D.C.Code Ann. §§ 40–812 to 40–812.2, 40–831 to 40–836 (1990). The 1989 regulations employ substantially the same definitions of

abandoned and junk vehicles as the earlier regulations, and there is no suggestion by either party that the new regulations effected any substantive change in D.C.'s policy with respect to the disposition of junk vehicles.

**4.** The regulations do not state explicitly that "junk" vehicles must also be "abandoned;" however, the regulations have been interpreted that way in practice. *See* Government of the District of Columbia, Commissioner's Administrative Instruction § 2730B.3(B) (September 21, 1973) (clarifying that "junk" vehicles must also be "abandoned"), *reprinted in* A.I. 121, 124; *see also* Brief for the Appellees at 3 n. 3.

practicable." *Id.* § 1105.4. After towing, *abandoned* vehicles are held in an impoundment lot for at least 45 days while attempts are made to contact the owner via registered letter and advertisements in the newspaper; *junk* vehicles, however, are towed directly to a demolition yard and immediately destroyed.

The regulations do not require any pre- or post-towing notice to owners of "junk" cars other than the warning sticker; and no hearing of any kind is required. The record reveals, however, that pursuant to a General Order to the MPD, enforcement officers are directed to "[m]ake a thorough investigation to determine ownership" of junk and abandoned vehicles, including canvassing the area in which the vehicle is found and checking the license number in the police computer. *See* METROPOLITAN POLICE DEPARTMENT, GENERAL ORDER, Series 601, No. 1 at Pt. III, § B (November 30, 1981), *reprinted in* A.I. 130, 148. Sergeant Jerome Gray, a supervisor in the Police Department's Abandoned Auto Section, testified that the efforts made by enforcement officers to contact the owners of junk and abandoned vehicles often are substantial, including telephone calls and personal visits. Mr. Haynesworth, an Abandoned Vehicle Investigator with the D.C. Department of Public Works, testified that officers routinely give extensions to owners who call and want more time to move their cars.

D.C. concedes, however, that any efforts by enforcement officers to contact owners are made out of courtesy and are not required, and that the granting of extensions to vehicle owners to move their cars is solely a matter of the enforcing officer's grace. Furthermore, D.C. concedes that the decisions of the enforcing officers—both as to the initial determination of whether a car is "junk" and as to any subsequent decision to grant or deny an extension—are not subject to review by anyone.

**B.** *Proceedings in the District Court*

On August 28, 1989, Propert filed the current action seeking damages from D.C. and Officer Stolburg for the destruction of his car. His amended complaint sought a declaratory judgment that D.C.'s policy regarding the towing and destruction of junk cars violates the due process clause of the Fifth Amendment.[5] The amended complaint also sought damages pursuant to 42 U.S.C. § 1983 and contained pendent claims for common law conversion and negligence.

Following discovery, Propert moved for partial summary judgment, arguing that D.C.'s failure to provide him with post-towing notice and a hearing violated his due process rights. D.C. filed a cross-motion to dismiss or, in the alternative, for summary judgment.

On July 27, 1990, following a hearing, the District Court issued an opinion granting D.C.'s motion and dismissing the complaint. *See Propert,* 741 F.Supp. at 963. Characterizing the issue as whether D.C. "provides the owners of junk automobiles with sufficient notice prior to seizing and destroying the[ir] cars," *id.* at 961, the trial court rejected Propert's argument that better notice and a post-towing hearing were required. The court reasoned that the warning sticker provided vehicle owners with constitutionally sufficient notice, and that Propert had not shown that notice by some other means would be more efficacious. *Id.* at 962–63. The court also held that while due process normally requires a hearing, D.C.'s informal extension procedures were sufficient in this case. Because an owner could avoid towing by simply moving his car, a hearing would accomplish little except to give the owner more time to move the car. Since extensions were already available through informal processes, the court reasoned, a formal hearing would serve only to "substitute a bureaucratic alternative" for existing procedures. *Id.* at 963.

---

**5.** Because D.C. is a political entity created by the federal government, it is subject to the restrictions of the Fifth Amendment, not the Fourteenth. *See Bolling v. Sharpe,* 347 U.S. 497, 499,

74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). The procedural due process components of the two Amendments are the same.

Because the District Court found no due process violation, it dismissed Propert's federal claims. The court did not comment separately on Propert's claims against Officer Stolburg, apparently reasoning that, to the extent Stolburg deviated from the D.C. policy, his actions were merely negligent and therefore non-actionable under section 1983. *See Daniels v. Williams,* 474 U.S. 327, 333, 106 S.Ct. 662, 666, 88 L.Ed.2d 662 (1986). Having dismissed Propert's federal claims, the District Court dismissed his pendent common law claims without prejudice for lack of subject matter jurisdiction. *Propert,* 741 F.Supp. at 963. This appeal followed.

## II. ANALYSIS

The District Court granted summary judgment to D.C. and dismissed Propert's complaint because the court concluded that Propert's due process rights were not violated. We review this question of law *de novo. See Sherwood v. Washington Post,* 871 F.2d 1144, 1145 (D.C.Cir.1989) (grant of summary judgment reviewed *de novo* ).

The issue before us is a narrow one. Propert's amended complaint alleges constitutional deficiencies in D.C.'s regulations and policy with respect to both abandoned and junk vehicles. However, in the proceedings before the District Court and at oral argument before this court, Propert narrowed the scope of his challenge to D.C.'s treatment of "junk" vehicles which, like his car, are properly licensed or registered. Consequently, the constitutionality of D.C.'s policy covering abandoned automobiles is not before us; nor is the question presented whether D.C.'s policy violates the constitutional rights of owners of unlicensed or unregistered vehicles identified as "junk." The only issue for decision, then, is whether D.C.'s conceded failure to provide any kind of hearing, or any form of notice other than the warning sticker, to owners of properly licensed or registered vehicles identified as "junk," offends the due process clause of the Fifth Amendment.

### A. *The Requirements of Due Process*

We follow a two-step process in deciding the constitutional question presented in this case. See *Ingraham v. Wright,* 430 U.S. 651, 672, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977). First, we must determine whether Propert has asserted a property interest encompassed within the protection of the due process clause; if he has, we go on to decide what process was due.

The first step of the analysis is straightforward. D.C. essentially concedes, as it must, that Propert had a protected property interest in his automobile. So long as a property deprivation is not *de minimis,* "its gravity is irrelevant to the question of whether account must be taken of the due process clause." *Goss v. Lopez,* 419 U.S. 565, 576, 95 S.Ct. 729, 737, 42 L.Ed.2d 725 (1975). In this case, even assuming Officer Stolburg's description of the vehicle to be accurate, Propert's economic interest in his car was certainly more than *de minimis. Cf. Price v. City of Junction, Texas,* 711 F.2d 582, 589 (5th Cir.1983) ("Whether a junk car has little or great value, it is constitutionally protected property.").

Having determined that Propert possessed a protected property interest in his automobile, the next question is what process was due. "The essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.' " *Mathews v. Eldridge,* 424 U.S. 319, 348, 96 S.Ct. 893, 909, 47 L.Ed.2d 18 (1976) (*quoting Joint Anti–Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 171–72, 71 S.Ct. 624, 648–49, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring)). Thus, the due process clause requires, at minimum, that the government provide notice and some kind of hearing before final deprivation of a property interest. *See Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 433, 102 S.Ct. 1148, 1156, 71 L.Ed.2d 265 (1982) ("[I]t has become a truism that '*some* form of hearing' is required before the owner is finally deprived of a protected property interest.") (citation omitted) (emphasis in original); *Gray Panthers v. Schweiker,* 652 F.2d 146, 165 (D.C.Cir.1980) (defining

"core requirements" of due process as "adequate notice ... and a genuine opportunity to explain"). The notice provided must be "reasonably certain to inform those affected," *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950), and the opportunity to be heard must be given "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965).

Beyond these threshold procedural requirements, the contours of due process are flexible and vary depending upon the circumstances of a given case. *See Zinermon v. Burch*, 494 U.S. 113, 127, 110 S.Ct. 975, 984, 108 L.Ed.2d 100 (1990). The precise form of notice and the precise kind of hearing required depends upon a balancing of the competing public and private interests involved, as defined by the now familiar *Mathews* factors: (1) the private interest affected by the government action; (2) the risk of erroneous deprivation and the value of additional safeguards; and (3) the government's interest, including the fiscal and financial burdens that additional or substitute procedural requirements would entail. *See Connecticut v. Doehr*, —— U.S. ——, 111 S.Ct. 2105, 2112, 115 L.Ed.2d 1 (1991); *Mathews*, 424 U.S. at 335, 96 S.Ct. at 903. Depending upon the tilt of the *Mathews* balance in a particular case, the usual requirement of written notice may be relaxed, *see Goss*, 419 U.S. at 581, 95 S.Ct. at 739, and the timing and content of the hearing may vary, *see, e.g., Mathews*, 424 U.S. at 347–49, 96 S.Ct. at 908–10. Nevertheless, however weighty the governmental interest may be in a given case, the amount of process required can never be reduced to zero—that is, the government is never relieved of its duty to provide *some* notice and *some* opportunity to be heard prior to final deprivation of a property interest. *See Logan*, 455 U.S. at 434, 102 S.Ct. at 1157 ("[T]he State may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement."); *Parratt v. Taylor*, 451 U.S. 527, 540, 101 S.Ct.

1908, 1915, 68 L.Ed.2d 420 (1981) ("Our past cases mandate that some kind of hearing is required at some time before a State finally deprives a person of his property interests.").

In *Cokinos v. District of Columbia*, 728 F.2d 502 (D.C.Cir.1983), we addressed the question of what process is due when the government tows illegally parked automobiles. There, we held that the absence of pre-towing process was constitutionally permissible where prompt post-towing notice and a hearing were provided. *See id.* at 502–03. In so holding, we relied upon *Sutton v. City of Milwaukee*, 672 F.2d 644 (7th Cir.1982), which upheld the constitutionality of an ordinance providing no pre-towing procedural safeguards to owners of illegally parked cars because notice and a hearing were provided promptly after towing. *See id.* at 648. Thus, *Cokinos* stands for the proposition, repeatedly sustained by the Supreme Court, that although the provision of procedural safeguards sometimes may be postponed, such safeguards must be provided prior to the time that a deprivation becomes final. *See, e.g., Parratt*, 451 U.S. at 541, 101 S.Ct. at 1916 ("The prior cases which have excused the prior-hearing requirement have rested in part on the availability of some meaningful opportunity subsequent to the initial taking for a determination of rights and liabilities.").

The rule that a hearing must occur before a deprivation becomes final has been applied uniformly in other cases involving the towing and impoundment of automobiles. Every court which has considered the issue has held that the owners of towed vehicles—whether illegally parked, abandoned or junk—are entitled, at minimum, to post-deprivation notice and a hearing. *See Draper v. Coombs*, 792 F.2d 915, 923 (9th Cir.1986) (holding towing statute unconstitutional where no provision for hearing); *Breath v. Cronvich*, 729 F.2d 1006, 1011 (5th Cir.) (holding that government must provide post-towing hearing to owners of illegally parked cars), *cert. denied*, 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 268 (1984); *Sutton*, 672 F.2d at 648 (requiring post-towing notice and hearing for owners of abandoned and illegally parked cars);

*Huemmer v. Mayor of Ocean City*, 632 F.2d 371, 372 (4th Cir.1980) (holding towing ordinance unconstitutional where it contained no provision for adequate notice or hearing); *Stypmann v. City of San Francisco*, 557 F.2d 1338, 1344 (9th Cir.1977) (requiring prompt post-towing hearing); *Mays v. Scranton City Police Dep't*, 503 F.Supp. 1255, 1262–63 (M.D.Pa.1980) (requiring post-towing notice and hearing for owners of abandoned vehicles); *Hale v. Tyree*, 491 F.Supp. 622, 625–26 (E.D.Tenn. 1979) (invalidating ordinance that failed to provide post-towing notice and hearing); *Craig v. Carson*, 449 F.Supp. 385, 394–95 (M.D.Fla.1978) (same); *Tedeschi v. Blackwood*, 410 F.Supp. 34, 43–46 (D.Conn.1976) (three judge court) (holding unconstitutional statute authorizing towing of abandoned vehicles without providing hearing); *Watters v. Parrish*, 402 F.Supp. 696, 699 (W.D.Va.1975) (finding section 1983 claim stated where statute provided for neither pre- nor post-towing hearing); *Graff v. Nicholl*, 370 F.Supp. 974, 982–83 (N.D.Ill. 1974) (three judge panel) (requiring *pre-towing* notice and hearing in context of abandoned automobiles); *Valdez v. City of Ottawa*, 105 Ill.App.3d 972, 61 Ill.Dec. 595, 599, 434 N.E.2d 1192, 1196 (1982) (holding that prompt post-towing notice and hearing required for owners of abandoned vehicles).

B. *The District of Columbia's Policy and Practice*

1. Opportunity to be Heard

■ In this case, D.C. concedes that its current policy provides no hearing procedure of any kind, either before or after towing. We conclude that this concession is fatal to the constitutional validity of D.C.'s policy.

There can be no serious dispute that some kind of hearing is necessary to safeguard the rights of vehicle owners. Under the current D.C. policy, an enforcing officer's decision to authorize the towing and destruction of an automobile identified as "junk" rests on three factual findings: (1) that the automobile is illegally parked; (2) that it is "abandoned;" and (3) that it is "in wrecked, dismantled, or irreparable condition." The enforcing officer's determination as to each of these factual issues is subject to some risk of error. The third determination, whether the car is "in wrecked, dismantled, or irreparable condition," is particularly subjective. *See Price*, 711 F.2d at 590 (determination of whether car is "junk" carries risk of error; old, damaged car may still be operable). Officer Stolburg's description of the evaluation technique that he uses—whether "you [would] take your mother to church in it"—provides little assurance of objectivity, or accuracy, in decisionmaking. Moreover, the enforcing officer's determination that a car is junk is not subject to review by his superiors, or anyone else. *See* Deposition of Richard Wood at 16–17, *reprinted in* A.I. 299, 314–15. Under these circumstances, we believe that some meaningful opportunity to be heard is essential before an owner's vehicle is destroyed.

■ D.C. appears to argue that the informal process described by D.C.'s witnesses at the summary judgment hearing— through which a car owner can try to contact the enforcing officer and attempt to secure an extension of time to move the vehicle or some other accommodation—satisfies the hearing requirement. We disagree. The constitutional requirement of some kind of hearing means, at a minimum, that the affected individual must have a meaningful opportunity to present his case before a neutral decisionmaker. *See Fuentes v. Shevin*, 407 U.S. 67, 83, 92 S.Ct. 1983, 1995, 32 L.Ed.2d 556 (1972); *Goldberg v. Kelly*, 397 U.S. 254, 269, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970); *Hale*, 491 F.Supp. at 626. Here, the process at issue satisfies neither requirement. The process does not provide a *meaningful opportunity* to be heard because, as D.C. concedes, communicating with the vehicle owner is a matter of the enforcing officer's grace and not the owner's entitlement. Nor is the requirement of an unbiased decisionmaker met. The officer to whom appeal may be made is the same officer who decides that the vehicle is "junk" in the first place; as such, serious questions as to

impartiality arise. *See Stypmann*, 557 F.2d at 1343 (police officer who authorizes tow not "wholly neutral" in subsequent dispute over propriety of towing); *Hale*, 491 F.Supp. at 626 (same).

D.C.'s second argument, which the District Court accepted, is that the hearing requirement may be dispensed with in the circumstances of this case because a vehicle owner whose car is "stickered" can avoid having his car towed by simply moving it. If an owner needs more time to arrange for the car to be moved, the argument goes, he can obtain an extension informally by contacting the officer who affixed the warning sticker. We have recognized that the constitutional requirements of notice and an opportunity to be heard are interrelated, and that the form and timing of the hearing required may vary depending upon the adequacy of the initial notice provided. *See Gray Panthers v. Schweiker*, 716 F.2d 23, 28 (D.C.Cir.1983) (noting "interplay that exists between the adequacy of a notice and the formality of a subsequent hearing"). Thus, if D.C. provided effective pre-towing notice to owners of vehicles identified as "junk," and if a meaningful opportunity to be heard was provided after towing, D.C.'s argument might have some force. Neither condition is met in this case, however.

### 2. Notice

On the record before us, we are convinced that the pre-towing notice provided by D.C. is not constitutionally sufficient. For one thing, the warning sticker does not provide constitutionally sufficient notice, at least where, as in this case, the vehicle is properly licensed or registered and, therefore, the owner's identity may be easily ascertained. The due process clause requires a form of notice "reasonably certain

to inform those affected ... or, where conditions do not reasonably permit such notice, that the form chosen is not substantially less likely to bring home notice than other of the feasible and customary substitutes." *Mullane*, 339 U.S. at 315, 70 S.Ct. at 658. D.C.'s warning sticker method of notice might be constitutionally sufficient where a car is without current license plates or a valid registration sticker, because in such cases the owner's identity often cannot be ascertained. But where, as in this case, a car is properly licensed and registered, notice by warning sticker is insufficient because it is less likely to notify the owner than other feasible substitutes.[6]

Other courts that have considered the issue have held that the sticker method of notice is insufficient where a car has license plates or a current registration. For example, in *Valdez v. City of Ottawa*, 105 Ill.App.3d 972, 61 Ill.Dec. 595, 434 N.E.2d 1192 (1982), a case in which a currently-registered vehicle was towed after a warning sticker was attached, the court held that

> [n]otice must be reasonably calculated to actually apprise the property owner of the opportunity to contest the government's proposed action. If the plaintiff's residence is readily and easily available, as is true here, the City may not rely on fortuitous or constructive notice to satisfy the Due Process Clause.... At a minimum, notice by certified or registered mail would have been *appropriate* in the instant case.

*Id.* 61 Ill.Dec. at 599, 434 N.E.2d at 1196 (emphasis in original); *see also Craig*, 449 F.Supp. at 395 (notice by letter necessary where officers have ready access to owner's name and address); *Graff*, 370 F.Supp. at 984 (sticker notice constitutional only if

---

**6.** For example, D.C. could send a certified letter to the owner's home address, which is reflected in D.C.'s license and registration records (as, indeed, D.C. does in the case of "abandoned" vehicles).

The potential shortcomings of the sticker method of notification are pointed up by the facts of this case; as D.C. concedes, the sticker attached to Propert's car on May 1st was no longer present when Officer Stolburg returned

to the scene on May 11th. Although notice by letter might not be effective in every case, it is more likely to afford actual notice and therefore better satisfies due process concerns. *Cf. Greene v. Lindsey*, 456 U.S. 444, 455–56, 102 S.Ct. 1874, 1880–81, 72 L.Ed.2d 249 (1982) (holding that posting notice on apartment door insufficient in eviction context; notice by letter required).

car lacks license plates and current registration).

It may be, as D.C. contends, that the warning sticker provides adequate pre-towing—as opposed to pre-destruction—notice to owners of vehicles that have been identified as "junk." *See Cokinos*, 728 F.2d at 502 (pre-deprivation process not required in context of non-emergency towing of illegally parked vehicles). *But cf. Zinermon*, 494 U.S. at 128–29, 110 S.Ct. at 984–85 (post-deprivation process may suffice only in limited situations, such as where quick action needed or pre-deprivation process impractical). D.C. does have a strong interest in removing abandoned and junk vehicles from the streets. Moreover, local law forbids parking in the same spot on a public street for more than 72 hours. Because the warning sticker remains in place for at least that amount of time, the sticker arguably suffices to give adequate *pre-towing* notice.

Even assuming that to be the case, however, D.C. still would be required to provide some post-towing (pre-destruction) process to owners of vehicles that have been identified as "junk" in order for its policy to pass muster under the *Mathews* balancing test. *See* 424 U.S. at 335, 96 S.Ct. at 903. In other words, even if D.C. may *tow* a vehicle that is seen to be "junk" pursuant to the sticker notice without offending due process, D.C. may not thereafter act to *destroy* the car without affording the owner post-towing notice and an opportunity to be heard. *See Cokinos*, 728 F.2d at 503. Under current D.C. policy, once a car has been towed as "junk," the automobile is destroyed almost immediately. Although D.C. may have a strong interest in the prompt removal of supposed junk vehicles from the streets, its interest in the immediate destruction of such vehicles is far from apparent. On balance, the severity of the deprivation imposed on the vehicle's owner, combined with the potential vagaries of the enforcing officer's determinations, outweighs any government interest in the immediate destruction of a towed vehicle that has been identified as "junk" and compels the conclusion that post-towing process is required.

D.C.'s disparate treatment of "junk" and "abandoned" vehicles illustrates the inade-quacy of its current policy. While both categories of vehicles are afforded the same pre-towing notice, abandoned vehicles are accorded much greater post-seizure protections. These protections include impoundment in a city lot for 45 days and notice to the owner via certified mail and newspaper advertisement. The apparent rationale for this disparate treatment is that abandoned autos may have value, whereas junk vehicles do not; however, the validity of that assumption hinges on the accuracy of the unilateral, unreviewed determination of the enforcing officer.

Finally, D.C. argues that providing additional procedural safeguards would be too expensive, pointing out that over 12,000 abandoned and junk vehicles are towed in D.C. every year. We find this contention to be unpersuasive. As a preliminary matter, we note that, while cost to the government is a factor to be weighed in determining the amount of process due, it is doubtful that cost alone can ever excuse the failure to provide adequate process. *See Fuentes*, 407 U.S. at 90 n. 22, 92 S.Ct. at 1999 n. 22; *Stypmann*, 557 F.2d at 1344; *Graff*, 370 F.Supp. at 984–85. In any event, D.C.'s claim of penury rings hollow in the context of this case. According to the D.C. official in charge of towing and impoundment, only about 10–20 percent of abandoned and junk vehicles have license plates or current registrations. *See* Deposition of Richard Wood at 41, *reprinted in* A.I. 299, 339. Therefore, there is no reason to assume that the addition of adequate process will place an intolerable burden on the public fisc. Moreover, with this judgment we mandate no particular substitute procedures; rather, we leave it to the local authorities to decide upon an approach that is both consistent with due process and cost effective.

We reiterate that our holding today is a narrow one. We hold that D.C.'s policy violates the due process rights of owners of properly licensed or registered automobiles that have been identified as "junk," and we find that Propert's due process rights were violated in this case. Accordingly, we reverse the District Court's grant

of summary judgment to D.C. and reinstate the complaint. We further direct the District Court to enter judgment for Propert on the liability phase of his section 1983 claim against D.C. We express no view on the amount of damages to which Propert is entitled, nor do we express a view on the question whether Office Stolburg possesses qualified immunity.

In short, we conclude that D.C.'s current policy with respect to junk vehicles is, like such vehicles themselves, in an irreparable state of disrepair. We leave it to the District Court to assess the towing fee and to the local authorities to select a newer model.

### III. Conclusion

For the reasons set forth above, we reverse the judgment of the District Court.

We hold that D.C.'s current policy with respect to the towing and destruction of supposed "junk" vehicles that are registered or licensed violates due process, and that Appellant's due process rights were violated in this case. We remand to the District Court for a determination of damages and for further proceedings not inconsistent with this opinion.

*So ordered.*