**UDC CHAIRS CHAPTER, AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, et al., Appellants,**

v.

**The BOARD OF TRUSTEES OF the UNIVERSITY OF the DISTRICT OF COLUMBIA, et al., Appellees.**

No. 93–7249.

United States Court of Appeals, District of Columbia Circuit.

Argued February 6, 1995.

Decided June 20, 1995.

Douglas B. Huron, Washington, DC, argued the cause and filed the briefs, for appellants.

David A. Splitt, Washington, DC, argued the cause, for appellees. With him on the brief was Robin C. Alexander, Washington, DC.

Before WALD, SILBERMAN, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

Facing a serious financial crisis, the University of the District of Columbia, an independent agency of the D.C. government, implemented a number of cost-saving measures, including a plan to scale back its 1992 summer school program by not extending summer contracts to its department chairpersons. Protesting this sharp departure from a decade-long practice of issuing such contracts, thirty-three of the department chairs filed suit under 42 U.S.C. § 1983 (1988). They claimed that the University had deprived them of a constitutionally protected property right without due process of law in violation of the Fifth Amendment and had breached their contractual rights as employees of the government of the District of Columbia. The district court granted summary judgment to the University with respect to the chairpersons' Fifth Amendment claim and dismissed their common law contract claim for failure to exhaust administrative remedies. We affirm the district court's grant of summary judgment. Even if the chairpersons had a constitutionally protected property interest in summer employment—an issue that we do not address—we hold that the University's grievance procedures, which the chairpersons did not pursue, would have accorded them all the process that they were due. We also affirm the district court's dismissal of the chairpersons' common law claim and decline to address their constitutional Contract Clause claim because they did not raise it in the district court.

## I.

The University's fifty departments are headed by chairpersons chosen from among the regular faculty by the deans of the relevant colleges. Chairpersons perform administrative and supervisory duties, in addition to teaching. Like regular faculty members, chairpersons are employed by the University pursuant to nine-month "academic year" contracts. Until the summer of 1992, the University also offered chairpersons additional contracts covering the eight-week summer term with compensation set at twenty-two percent of their academic year faculty salaries.

In the autumn of 1991, the University began to address budget shortfalls that it anticipated would result from reduced government funding and depletion of its cash reserves. Dr. Tilden LeMelle, President of the University, proposed a wide range of initiatives designed to lower operating costs, such as hiring freezes, pay cuts and program restructuring. One of his recommendations led to a decision not to issue contracts to department chairpersons for the 1992 summer term.

On April 28, 1992, Acting Provost and Vice–President for Academic Affairs Marcellina Brooks formally announced the summer contract decision to the deans and instructed them to inform their respective chairpersons. Two weeks later, on May 14, she sent a written memorandum directly to the chairpersons, advising them that: "In the interest of expanding the course offerings during this time of fiscal limitations, the University will not employ department chairpersons this summer. You will resume your duties as chairperson effective August 16, 1992." Memorandum from Marcellina Brooks, Acting Provost and Vice–President for Academic

Affairs, to Department Chairpersons (May 14, 1992), *in* Joint Appendix (J.A.) at 216. This decision became effective at the beginning of the summer term, a few days after the academic year ended on May 15.

Surprised by this change in the University's practice of issuing summer contracts, the chairpersons complained to their respective deans. The deans uniformly disclaimed any ability to alter the administration's decision. On behalf of a group of chairpersons, one chairperson wrote to President LeMelle requesting that he "direct[ ] immediate issuance of chairpersons' summer employment contracts" or "notify me ... of the appropriate procedures for bringing a formal grievance against the University on behalf of the departmental chairpersons." Letter from Dr. Wilmer L. Johnson to Dr. Tilden J. LeMelle 2 (June 9, 1992), *in* J.A. at 66. Although the President's response said that he had forwarded the letter to the University's General Counsel, Letter from Dr. Tilden J. LeMelle to Dr. Wilmer L. Johnson (July 7, 1992), *in* J.A. at 68, the chairpersons did not receive a formal response from the General Counsel's office. Nor did the chairpersons initiate a formal grievance.

In January of the following year, thirty-three of the department chairpersons brought this suit under 42 U.S.C. § 1983 against the Board of Trustees of the University, President LeMelle and Acting Provost Brooks, alleging that they had been deprived of summer employment in 1992 without due process in violation of the Fifth Amendment. *See Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954) (applying Fifth, rather than Fourteenth, Amendment to District of Columbia). Apart from a general claim for notice and a pre-deprivation hearing, the chairpersons did not specify the process they sought. They moved for partial summary judgment on liability, reserving the issue of damages for a jury. The University cross-motioned for a complete disposition of the case through summary judgment.

The district court rejected the chairpersons' claim that a property right to summer employment arose from the D.C. Municipal Regulations, D.C.Mun.Regs. tit. 8 (1988), or from the University's practice of issuing summer contracts to department chairs. In the absence of a "mutually explicit understanding," *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972), or "a legitimate claim of entitlement," *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), the district court held that the chairpersons had no constitutionally protected property interest and granted summary judgment in favor of the University on the chairs' Fifth Amendment due process claim. The chairpersons also raised a common law contract claim that the district court dismissed for failure to exhaust administrative remedies. The chairpersons appeal both decisions of the district court, adding a third claim that the University violated the Contract Clause of the Constitution.

## II.

We review *de novo* the district court's grant of summary judgment. *See Propert v. District of Columbia*, 948 F.2d 1327, 1331 (D.C.Cir.1991). We must decide whether a "genuine issue as to any material fact" exists and, if not, whether "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We give the party against whom summary judgment was granted "the benefit of all reasonable evidentiary inferences that can be drawn in his favor." *Abourezk v. New York Airlines, Inc.*, 895 F.2d 1456, 1458 (D.C.Cir.1990) (internal quotation marks and citations omitted). And of significance for this case, we may determine whether summary judgment should be granted on different grounds than those upon which the district court relied. *See Doe v. Gates*, 981 F.2d 1316, 1322 (D.C.Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 337, 126 L.Ed.2d 282 (1993).

In order to assess whether the government has violated the Fifth Amendment's Due Process Clause, we engage in a "familiar two-part inquiry": we must determine whether the plaintiffs were deprived of a protected interest, and, if so, whether they received the process they were due. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428, 102 S.Ct. 1148, 1153–54, 71 L.Ed.2d 265 (1982); *see also Reeve Aleutian Airways, Inc. v. United*

*States,* 982 F.2d 594, 598 (D.C.Cir.1993). The district court granted summary judgment for the University after deciding that the chairs had no constitutionally protected property interest to compensation for the 1992 summer term. We find it unnecessary to decide that issue because, even assuming that a property interest existed, we conclude that the chairpersons would have received adequate due process under the University grievance procedures had they used them.

In response to the question "what process is due," *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972), the Supreme Court has established a "general rule that individuals must receive notice and an opportunity to be heard before the Government deprives them of property." *United States v. James Daniel Good Real Property,* —— U.S. ——, ——, 114 S.Ct. 492, 499, 126 L.Ed.2d 490 (1993); *see also Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985) ("essential principle" of Due Process Clause is prior notice and hearing). Due process, while "flexible" and determined by the particular circumstances of each situation, *Morrissey v. Brewer,* 408 U.S. at 481, 92 S.Ct. at 2600, requires, at a minimum, an "opportunity to be heard at a meaningful time and in a meaningful manner," *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (internal quotation marks and citation omitted).

The chairs claim that the notice they received was insufficient, but they do not support this assertion, nor could they: the department chairpersons received written notice of the administration's decision from Acting Provost Brooks on May 14. Brooks' memorandum clearly satisfies the due process requirement that notice be "reasonably calculated to reach interested parties." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 318, 70 S.Ct. 652, 659, 94 L.Ed. 865 (1950); *see also Loudermill,* 470 U.S. at 546, 105 S.Ct. at 1495 (due process entitles tenured public employee to "oral or written notice of the charges against him"); *Propert v. District of Columbia,* 948 F.2d 1327, 1332 (D.C.Cir.1991) (noting "usual requirement of written notice"). Assured that the University gave adequate notice of its decision, we focus on whether it provided the chairs with an opportunity to be heard that would satisfy the minimal requirements of due process. We thus turn to an analysis of the University's grievance procedures.

The University's grievance procedures, adopted in compliance with D.C.Code Ann. § 1–617.2(a) (1992) and set forth in D.C.Mun. Regs. tit. 8, ch. 16 (1988), offer employees an opportunity to challenge a decision or policy of the University. A "grievance" encompasses complaints alleging a "violation ... of University rules or applicable law" or "[a] failure to act pursuant to the policies and practices of the University...." *Id.* at § 1600.3. Upon lodging a formal written grievance, a grievant has the opportunity to engage in "informal discussions" with an immediate supervisor, *id.* at § 1603.2, who in turn grants the relief sought or refers the matter, within five days, to the next level supervisor, *id.* at § 1603.3. If, as would have been the case here, the second level supervisor is a vice-president, the grievant can request review by an impartial panel. *Id.* at § 1605.2.

The regulations require the impartial panel to conduct an independent inquiry, *id.* at § 1606.1, which may include gathering documentary evidence, conducting personal interviews, calling a group meeting, holding an informal hearing or any combination thereof, *id.* at § 1606.2. If the panel holds a hearing, it must seek "to bring out pertinent facts regarding the grievance raised," *id.* at § 1607.2, and the grievant has a right to present witnesses, *id.* at § 1608.1. After the panel has conducted its inquiry, it must afford the grievant an opportunity to review the investigative file and to respond. *Id.* at § 1606.3. The panel then reports its findings and recommendations to the appropriate vice-president and the grievant. *Id.* While the regulations provide no time limit for the panel's proceedings, they do require the vice-president to make a decision within fifteen days of receipt of the panel's recommendations. *Id.* at § 1609.1. In most cases, including this one, the grievant has a right to appeal to the D.C. Office of Employee Appeals, *id.* at § 1609.5; *see also* D.C.Code

Ann. § 1–617.3(b) (1992), and any subsequent decision by the Office of Employee Appeals may be appealed to the Superior Court of the District of Columbia, *see* D.C.Code Ann. § 1–606.3(d) (1992).

We are satisfied that these procedures incorporate the basic element of due process: the opportunity to be heard by a neutral decision-maker. *See Propert,* 948 F.2d at 1333; *see also Logan v. Zimmerman Brush Co.,* 455 U.S. at 433, 102 S.Ct. at 1156 ("Due Process Clause grants the aggrieved party the opportunity to present his case and have its merits fairly adjudged."). A grievant may "present his side of the story," *Loudermill,* 470 U.S. at 546, 105 S.Ct. at 1495, at several stages of the process, including before an impartial panel, and may appeal the University's decision to the D.C. Office of Employee Appeals and then to the Superior Court. The issue before us in this case is whether the grievance procedures offer this opportunity to be heard at a "meaningful time." *Mathews v. Eldridge,* 424 U.S. at 333, 96 S.Ct. at 902 (internal quotation marks and citation omitted).

The chairpersons argue that the procedures could not have provided them with a hearing before the deprivation occurred, contending that a "pre-deprivation" hearing is required by the Due Process Clause. We, of course, cannot know for certain whether the University's procedures could have afforded review by an impartial panel before the summer term began since the chairpersons never took advantage of them. As we understand the record, however, a hearing prior to the beginning of the summer term was at least possible. Had the chairpersons filed a formal written grievance immediately after their deans informed them of the administration's decision, they could have requested review by an impartial panel within five days. *See* D.C.Mun.Regs. tit. 8, § 1603.3. Although the regulations do not establish any binding deadlines for an investigative panel, it is possible that a panel would have moved quickly in light of the impending opening of the summer term.

The outcome of this case, however, does not turn on whether the University's procedures could have provided a hearing prior to the beginning of the summer term, for we conclude that, under these circumstances, due process does not require one. Nothing in *Propert v. District of Columbia, supra,* upon which the chairs principally rely to support their contention that a pre-deprivation hearing is required, is to the contrary. There we held that the District of Columbia's procedures for destroying a registered vehicle identified as "junk" failed to satisfy the minimum requirements of due process, not because a pre-deprivation hearing was not held, but because the District provided no hearing procedure at all. 948 F.2d at 1333.

While a pre-deprivation hearing is certainly the preferred manner of satisfying due process, the Supreme Court has made clear that a post-deprivation opportunity to be heard is sufficient in "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *James Daniel Good,* — U.S. at —, 114 S.Ct. at 501 (internal quotation marks and citations omitted); *see also Logan v. Zimmerman Brush Co.,* 455 U.S. at 436, 102 S.Ct. at 1158 (noting that post-deprivation process may be sufficient when state must necessarily act quickly or it is impractical to provide pre-deprivation process). Determining whether a post-deprivation hearing would satisfy the minimal requirements of due process involves "an examination of the competing interests at stake, along with the promptness and adequacy of later proceedings." *James Daniel Good,* — U.S. at —, 114 S.Ct. at 501. As directed by the Supreme Court in *James Daniel Good,* we balance the three factors set forth in *Mathews v. Eldridge:* the private interest affected; the risk of erroneous deprivation of that interest and the likely value of additional safeguards; and the Government's interest. *See id.* (citing *Mathews v. Eldridge,* 424 U.S. at 335, 96 S.Ct. at 903); *see also Board of Governors v. DLG Financial Corp.,* 29 F.3d 993, 1002–03 (5th Cir. 1994), *cert. dismissed,* — U.S. —, 115 S.Ct. 1085, 130 L.Ed.2d 1055 (1995).

We begin with "the private interest that will be affected" by the University's decision. *Mathews v. Eldridge,* 424 U.S. at 335, 96

S.Ct. at 903. This case is not like *Cleveland Board of Education v. Loudermill,* where the employer fired the plaintiff under what later employers might consider "questionable circumstances." 470 U.S. at 543, 105 S.Ct. at 1493–94. Here, the chairpersons kept both their faculty jobs and chair positions, losing only the benefits of an eight-week summer contract. The University plainly expected the chairs to resume their duties in August, thus removing any suggestion that it considered the chairpersons individually incompetent or inadequate. The chairs suffered no stigma, diminished reputations or barriers to future employment as a result of the University's decision not to employ them for the summer. Their interest boils down to one thing: receiving compensation for the summer term. While we do not underestimate their interest in summer paychecks, the loss is a purely financial one that is completely compensable by a post-deprivation decision favorable to the chairpersons. *Cf. Royster v. Board of Trustees of Anderson County School,* 774 F.2d 618, 621 (4th Cir.1985) (holding that no deprivation of property interest occurred when school superintendent was terminated with full pay and benefits through end of contract), *cert. denied,* 475 U.S. 1121, 106 S.Ct. 1638, 90 L.Ed.2d 184 (1986).

We next consider "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," the second of the three *Mathews* factors. *Mathews v. Eldridge,* 424 U.S. at 335, 96 S.Ct. at 903. In this context, where the question before us is the adequacy of a post-termination hearing, we understand this factor to require us to ask whether "the risk of an erroneous deprivation" would be reduced if the entire grievance procedures, including the opportunity for review by an impartial panel, were completed prior to the beginning of the summer term. Unlike cases involving the termination of welfare payments, *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), Social Security disability benefits, *Mathews v. Eldridge,* 424 U.S. at 319, 96 S.Ct. at 895, utility services, *Memphis Light, Gas & Water Division v. Craft,* 436 U.S. 1, 98 S.Ct.

1554, 56 L.Ed.2d 30 (1978), or dismissal for cause, *Loudermill,* 470 U.S. at 532, 105 S.Ct. at 1487, where the Supreme Court has held that the presence of individual characteristics makes pre-deprivation hearings particularly important, the individual characteristics, qualifications or reputations of the chairpersons are not at issue in this case. The decision not to offer summer contracts was precipitated by the president's determination, made only after months of analysis regarding budget shortfalls and potential cost-saving measures, that the University faced a serious financial crisis. Where, as here, the deprivation turns on a policy decision and not on an individual's characteristics, a pre-deprivation hearing would do little to reduce the risk of erroneous deprivation of the chairpersons' interests. *See, e.g., Brown v. Brienen,* 722 F.2d 360, 366 (7th Cir.1983); *see id.* at 368 (Flaum, J., concurring) ("risk of government error and the value of pre-deprivation hearing in reducing that risk" is "insubstantial" when decision not to grant compensatory time off is based on staffing shortages and individualized determinations of fact or law are not necessary).

With respect to the final *Mathews* factor—the government's interest, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail," *Mathews v. Eldridge,* 424 U.S. at 335, 96 S.Ct. at 903—the University describes its interest in the starkest of terms: it sought to address "a severe financial crisis" and to avoid "insolvency." Appellees' Brief at 8–9. The decision not to hire the chairpersons for the summer term represented one of many cost-saving measures that the University implemented to preserve its fiscal stability. The Supreme Court has long recognized the government's interest in remaining solvent, a concern that usually arises in the context of revenue collection, *see, e.g., Phillips v. Commissioner,* 283 U.S. 589, 595–97, 51 S.Ct. 608, 611–12, 75 L.Ed. 1289 (1931) (no prior judicial hearing required before payment of deficiency assessment for income taxes as government has need "promptly to secure its revenues"), but that is equally applicable here. Requiring the University to postpone,

in effect to forego, the savings from elimination of summer contracts could add significantly to its financial crisis.

Weighing the *Mathews* factors, we find that, under the circumstances of this case, the grievance procedures would have satisfied due process even if they could not have been completed until after the beginning of the summer program. The chairpersons' private interest was strictly monetary, of limited duration, without personal stigma and fully compensable through a post-deprivation financial award in their favor; pre-deprivation hearings were not likely to reduce the risk of an erroneous decision; and finally the government's interest in continuing to provide educational services to the community while remaining solvent was substantial. *See Memphis Light*, 436 U.S. at 19, 98 S.Ct. at 1565 ("[W]here the potential length or severity of the deprivation does not indicate a likelihood of serious loss and where the procedures underlying the decision to act are sufficiently reliable to minimize the risk of erroneous determination, government may act without providing additional advance procedural safeguards." (internal quotation marks and citation omitted)); *see also Reeve Aleutian Airways*, 982 F.2d at 602 (holding that post-deprivation hearing, combined with other procedural protections, fulfilled minimal due process requirements owed to air carrier who was temporarily suspended from transporting military personnel). We affirm the district court's grant of summary judgment for the University.

### III.

■ The district court dismissed the chairpersons' breach of contract claim because they had failed to exhaust their administrative remedies under the District of Columbia Comprehensive Merit Personnel Act, D.C.Code Ann. §§ 1–601.1 to 1–637.2 (1992), and the University's grievance procedures, D.C.Mun.Regs. tit. 8, ch. 16. The chairpersons do not appeal the district court's determination that their contract claim fell within the statutory definition of "grievance," nor do they appeal the court's determination that they did not avail themselves of the grievance procedures. Instead, they argue that

pursuing their administrative remedies would have been futile because "the relevant officials [had] already committed themselves to a course of action." Appellants' Brief at 29. Even construing the allegations of the complaint most favorably to the pleader, as we are required to do when reviewing a dismissal for lack of subject matter jurisdiction, *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), we find nothing in the chairpersons' pleadings to support their claim of futility.

In this circuit, the exhaustion requirement "may be waived only in the most exceptional circumstances." *Communications Workers of America v. AT & T*, 40 F.3d 426, 432 (D.C.Cir.1994) (internal quotation marks and citation omitted). Although futility can amount to just such an exceptional circumstance where "an agency has articulated a very clear position on the issue which it has demonstrated it would be unwilling to reconsider," we require the "certainty of an adverse decision" or indications that pursuit of administrative remedies would be "clearly useless." *Randolph–Sheppard Vendors of America v. Weinberger*, 795 F.2d 90, 105 (D.C.Cir.1986) (internal quotation marks and citation omitted); *see also Communications Workers*, 40 F.3d at 432; *Committee of Blind Vendors v. District of Columbia*, 28 F.3d 130, 133 n. 5 (D.C.Cir.1994). The mere "probability of administrative denial of the relief requested does not excuse failure to pursue" administrative remedies, *Randolph–Sheppard*, 795 F.2d at 106; rather "[plaintiffs] must show that it is certain that their claim will be denied." *Smith v. Blue Cross & Blue Shield United*, 959 F.2d 655, 659 (7th Cir. 1992).

To demonstrate the futility of pursuing a grievance, the chairpersons cull several allegations from their complaint, including: "The deans said that they were not a party to the decision and could not do anything about it," Complaint, UDC Chairs Chapter, Am. Ass'n of Univ. Professors, No. 93cv0141, at ¶ 9 (D.D.C. Jan. 21, 1993), *in* J.A. at 6; a representative of the chairpersons wrote to President LeMelle requesting that summer contracts be issued to the chairpersons or that the President notify the chairpersons "of the

appropriate procedures for bringing a formal grievance against the University on behalf of the department chairpersons," but the President's only response was to forward the letter to the University's General Counsel, *id.*; and finally the General Counsel "acknowledged" to two of the plaintiffs that chairs would have to "file suit" if they wanted compensation for the summer of 1992, *id.* at ¶ 10, *in* J.A. at 7. These allegations, which add up to the proposition that the deans would not, or could not, reconsider the summer contract decision and that an appeal to the Provost, the person who announced the decision, would be futile, fall short of demonstrating to us that the University's grievance procedures would have been "clearly useless." *Randolph–Sheppard,* 795 F.2d at 105. A mere presumption that the University would not reconsider its position does not rise to the level of certainty required to invoke the futility exception. *See, e.g., Communications Workers,* 40 F.3d at 433 ("Even if one were to concede that an unfavorable decision … was *highly likely,* that does not satisfy our strict futility standard requiring a *certainty* of an adverse decision."). This is particularly true where, as here, the chairpersons could appeal the Provost's decision to an impartial entity, the D.C. Office of Employee Appeals. *See* D.C.Mun.Regs., tit. 8, § 1609.5; *see also* D.C.Code Ann. § 1–617.3(b). Finding no basis for concluding that resort to the grievance procedures would have been futile, we affirm the district court's dismissal of the chairs' common law contract claim.

Finally, we decline to consider the chairpersons' claim of a Contract Clause violation. U.S. Const. art. I, § 10, cl. 1. They raised it for the first time on appeal, and this court has consistently declined to decide claims not raised in the district court. *See, e.g., Boehner v. Anderson,* 30 F.3d 156, 162 (D.C.Cir. 1994).

*So ordered.*