WASHINGTON TEACHERS' UNION LO-CAL # 6, AMERICAN FEDERATION OF TEACHERS, AFL–CIO, et al., Appellants,

v.

The BOARD OF EDUCATION OF THE DISTRICT OF COLUMBIA, et al., Appellees.

No. 96–7181.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 27, 1997.

Decided March 21, 1997.

Sally M. Tedrow, Washington, DC, argued the cause, for appellants. With her on the brief were James R. O'Connell and Curtis J. Lewis.

Donna M. Murasky, Assistant Corporation Counsel, Washington, DC, argued the cause, for appellees. With her on the brief were Charles F.C. Ruff, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel. Lutz A. Prager, Assistant Deputy Corporation Counsel, entered an appearance.

Before: GINSBURG, HENDERSON and TATEL, Circuit Judges.

TATEL, Circuit Judge:

Responding to the financial crisis facing the District of Columbia and exercising newly granted Congressional authority to implement emergency reductions-in-force, the Board of Education fired over 400 teachers in July 1996. Several laid-off teachers and their union sued, claiming that because principals selected teachers for firing based on school-wide rather than system-wide seniority and considered teachers' professional experiences, contributions to their schools, and other non-seniority factors in ranking teachers for retention, the RIF violated the teachers' collective bargaining agreement and thus the Contract Clause of the United States Constitution. The Union also argued that the District's failure to provide pre-termination hearings violated the Fifth Amendment's Due Process Clause. We affirm the district court's grant of summary judgment for the District. Not only were the emergency RIF procedures authorized by Congress, which is not subject to the Contract Clause, but we discern no conflict between those procedures and the collective bargaining agreement. The Due Process Clause does not require pre-termination hearings where, as here, the RIF is necessitated by a serious financial crisis, principals' decisions are highly discretionary, and D.C. law provides for post-termination challenges.

I

Until May 1996, District of Columbia regulations governing reductions-in-force of teachers and other employees in the Educational Service operated on the basis of seniority. D.C. Mun. Regs. tit. 5, § 1504 (1995). Under those regulations, teachers were grouped according to tenure status—permanent, probationary, or temporary—and within those three categories, further separated into subgroups depending on veteran status. *Id.* § 1501. Within each subgroup, employees were ranked according to years of service. *Id.* § 1501.5(b). Employees earning "outstanding" ratings on their most recent performance evaluations were credited with four extra years of service. "Unsatisfactory" performance evaluations stripped employees of retention rights. *Id.* §§ 1503.4–.5. Reductions-in-force began by firing least-senior, non-veteran temporary employees, continuing if necessary to temporary employees with veteran status, then to non-veteran and veteran probationary employees, and finally to non-veteran and veteran permanent employees. *Id.* § 1504.

Also prior to May 1996, reductions-in-force were implemented agency-wide. D.C. CODE ANN. § 1–625.1 (1992 Repl.). Teachers competed with teachers in every other school for their positions; their "competitive area" was the entire school system, and their "competitive level" flowed from the requirements of their particular teaching positions. *See id.*; D.C. Mun. Regs. tit. 5, § 1501.1 (defining "competitive level"). Eliminating ten social studies teacher positions, for example, required city-wide assessment of tenure status, years of service, and performance ratings of all social studies teachers in the school system. Depending on seniority and performance ratings, more-senior teachers could supplant less-senior teachers in other schools.

These procedures were changed significantly by two statutes enacted by Congress to deal with the District's financial crisis: the District of Columbia Financial Responsibility and Management Assistance Act of 1995, Pub.L. No. 104–8, 109 Stat. 97 (1995), and the District of Columbia Appropriations Act of 1996 ("Budget Act"), Pub.L. No. 104–134, 110 Stat. 1321 (1996). The Financial Responsibility Act, which created the city's Control Board, repealed the 1979 Home Rule Act's guarantee of personnel benefits "at least equal to those provided [under the federal system]" to all federal employees who, with the advent of home rule, became District employees, replacing it with the following provision: "nothing in [the Home Rule Act] shall prohibit the District from separating an officer or employee ... in the implementation of a financial plan and budget for the District government approved under [the Financial Responsibility Act.]" Pub.L. 104–8, Tit. II, § 202(h), 109 Stat. 97, 116 (codified as

amended at D.C.Code Ann. § 1–242(3) (1996 Supp.)).

Enacted one year later, the 1996 Budget Act amended the District's personnel statutes in two relevant respects. First, it amended section 1–625.1 of the D.C.Code to allow agency heads to establish "lesser competitive areas within an agency" for purposes of a reduction-in-force. Pub.L. 104–134, Tit. I, § 149(a), 110 Stat. 1321, 1321–97 (codified as amended at D.C.Code Ann. § 1–625.1 (1996 Supp.)). This amendment permitted the Superintendent of Schools to designate each school as a separate "competitive area," so that teachers at one school would compete for available positions only with teachers in that school, rather than city-wide.

Second, the Budget Act temporarily amended District law governing reductions-in-force by enacting section1–625.5 of the D.C.Code. Pub.L. 104–134, Tit. I, § 149(b), 110 Stat. 1321, 1321–98 (codified at D.C.Code Ann. § 1–625.5 (1996 Supp.)). Subsection (a) of the new statute provided: "Notwithstanding any other provision of law, regulation, or collective bargaining agreement either in effect or to be negotiated while this legislation is in effect for the fiscal year ending September 30, 1996, each agency head is authorized, within the agency head's discretion, to identify positions for abolishment." D.C.Code Ann. § 1–625.5(a). Subsection (c) provided that "[n]otwithstanding any rights or procedures established by any other [personnel statute], any District government employee, regardless of date of hire, who encumbers a position identified for abolishment shall be separated without competition or assignment rights, except as provided in this section." Id. § 1–625.5(c). An employee "affected by the abolishment of a position" under section1–625.5 was entitled to "[one] round of lateral competition pursuant to Chapter 24 of the District of Columbia Personnel Manual ... limited to positions in the employee's competitive level." Id. § 1–625.5(d).

Section 1–625.5 of the D.C.Code also prohibited RIF'd teachers from challenging "the establishment of a competitive area smaller than an agency, ... the determination that a specific position is to be abolished, [ ]or separation pursuant to this section...." Id. § 1–625.5(g). Laid-off employees could appeal separation on three grounds. If they believed their terminations were discriminatory, they could file complaints for violation of the District of Columbia Human Rights Act with the District's Office of Human Rights. Id. § 1–625.5(g)(1); see also. id. § 1–2544 (1992 Repl.). If they believed their terminations were in retaliation for protected speech in violation of their rights as District employees, they could file suit in Superior Court. Id. §§ 1–616.2–.3 (1992 Repl.). Or if they believed the notice and separation procedures of section 1–625.5 were not followed, they could file complaints with the Office of Employee Appeals. Id.§ 1–625.5(g)(2).

In May 1996, a month after Congress passed the Budget Act, the School Board repealed its regulations governing reductions-in-force and enacted emergency rules instituting new RIF procedures. D.C. Mun. Regs. tit. 5, § 1500 (1996). Instead of basing RIFs on seniority, the new rules directed school principals to fill out a "competitive level documentation form"—the "CLDF"—ranking all teachers occupying positions slated for abolishment on a scale of 1 to 25 in each of four areas: (1) relevant contributions, accomplishments, or performance, including "negative factors" such as disciplinary and attendance problems and failure to meet professional responsibilities; (2) relevant professional experience; (3) office or school needs, including curriculum and extracurricular sponsorship; and (4) length of service, with five years added for District residents. Id. § 1503; D.C.Code Ann.§ 1–625.5(e) (awarding five additional years of service for District residents); Decl. of James R. Daugherty (July 17, 1996), Ex. 4. Other than the computation of each teacher's length of service, performed by the School Board's human resources division, the regulations effectively made principals' rankings unreviewable by other school district officials. Daugherty Decl., Ex. 2 at 4–5.

Immediately after the Board issued the emergency rules, the Superintendent notified principals of the number of positions abolished at their schools. Principals then determined which positions at which competitive levels to abolish. Id. at 4. Using CLDF's

and giving teachers an opportunity to review and sign them, principals selected teachers to be RIF'd. Beginning in mid-June, RIF'd teachers were given thirty days' notice of the loss of their positions. In July, at each school in the District, in each competitive level where teaching positions were eliminated, teachers with the lowest total scores on their ranking forms lost their jobs. Each of the over 400 teachers who were laid off received severance pay keyed to years of service. Daugherty Decl., Ex. 5.

The Washington Teachers' Union, the sole bargaining representative of the District's approximately 5,000 teachers, together with three RIF'd teachers, filed suit in the United States District Court for the District of Columbia. They claimed that by enacting the emergency rules governing the reduction-in-force, the School Board breached the Union's collective bargaining agreement in violation of the Constitution's Contract Clause; violated teachers' Fifth Amendment procedural and substantive due process rights; and violated the Home Rule Act. After a hearing, the district court granted summary judgment for the District, and plaintiffs appealed. Our review is *de novo*. *Tao v. Freeh*, 27 F.3d 635, 638 (D.C.Cir.1994).

II

■ We begin with the Union's argument that the RIF procedures carried out under the emergency rules conflicted with the collective bargaining agreement, thus violating the Constitution's Contract Clause, U.S. CONST., art. I, § 10. Although the District of Columbia is subject to the Contract Clause, D.C.CODE ANN. § 1–204 (1992 Repl.), the legislation which led the Board of Education to repeal its reduction-in-force regulations was enacted by Congress, and Congress is not subject to the Contract Clause, even when legislating for the District. *John McShain, Inc. v. District of Columbia*, 205 F.2d 882, 883 (D.C.Cir.1953); *District of Columbia v. American Fed'n of Gov't Employees*, 619 A.2d 77, 81 (D.C.1993). Congress authorized agency heads to designate "competitive areas" smaller than the entire school system, D.C.Code Ann. § 1–625.1, permitted agency heads to identify positions

for abolishment "notwithstanding any other provision of law, regulation, or collective bargaining agreement," *id.* § 1–625.5(a), and provided that any District employee, "regardless of date of hire, who encumbers a position identified for abolishment shall be separated without competition or assignment rights, except as [specifically] provided. . . ." *Id.* § 1–625.5(c). Because the 1996 Budget Act amendments expressly authorized the emergency rules, they are insulated from challenge under the Contract Clause.

■ Claiming that the Board exceeded its 1996 Budget Act authority when it adopted the emergency rules, the Union argues that the rules independently impaired the collective bargaining agreement. We need not decide whether the Board exceeded its Congressional authority, however, for even if it did, we find no violation of the Contract Clause. To determine whether a change in law or regulation violates the Contract Clause, we ask the three questions set forth in *General Motors Corp. v. Romein*, 503 U.S. 181, 186, 112 S.Ct. 1105, 1109–10, 117 L.Ed.2d 328 (1992): Does a contractual relationship exist? Did a change in law or regulation impair that relationship? If a contract has been impaired, was the impairment substantial? If these questions lead to the conclusion that a substantial impairment occurred, we then ask whether the change is "reasonable and necessary to serve an important public purpose." *United States Trust Co. v. New Jersey*, 431 U.S. 1, 25, 97 S.Ct. 1505, 1519, 52 L.Ed.2d 92 (1977).

We need go no farther than *Romein*'s second question. The collective bargaining agreement says nothing about system-wide seniority procedures in the event of a RIF. Article 43 of the collective bargaining agreement, captioned "Reduction–In–Force and Furlough," provides: "Prior to a reduction-in-force or furlough during the life of this Agreement, the Board agrees to consult with the Union." Agreement Between the Board of Education of the District of Columbia and the Washington Teachers' Union Local 6, art. 43. According to the record, the School Board consulted extensively with the Union before the RIF occurred. Aff. of Eva R. Rousseau (July 19, 1996) ¶ 2. Because the

collective bargaining agreement required nothing more of the Board, the District's adoption of the emergency regulations did not impair the collective bargaining agreement.

The Union argues that seniority-driven, system-wide RIF procedures are implicit in the collective bargaining agreement—specifically, that the procedures are the "law of the shop," based on the parties' longstanding past practice. Appellants' Br. at 17. But as the District points out, labor arbitrators, not courts, consult the "law of the shop." "Skilled labor arbitrators, rather than judges, are better positioned and equipped to identify and to apply the common law of the shop." *McKinney v. Emery Air Freight Corp.*, 954 F.2d 590, 595 (9th Cir.1992); *see also United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960) ("The labor arbitrator is usually chosen because of the parties' confidence in his knowledge of the common law of the shop.... The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed."); *NCR Corp., E&M-Wichita v. International Ass'n of Machinists and Aerospace Workers*, 906 F.2d 1499, 1501 (10th Cir.1990); *International Ass'n of Machinists and Aerospace Workers v. General Elec. Co.*, 865 F.2d 902, 906 (7th Cir.1989).

We are equally unpersuaded by the Union's argument that the emergency rules violated the Contract Clause because they conflicted with the collective bargaining agreement's requirement to evaluate all teachers pursuant to a "Teacher Appraisal Form," known as a "TAP." Agreement Between the Board of Education of the District of Columbia and the Washington Teachers' Union Local 6, art. 17. The emergency rules did not supplant teacher evaluation pursuant to the TAP; the rules' only function was to implement the 1996 RIF. For all other purposes, the TAP remains alive and well. For the same reason, contrary to the Union's argument, nothing in the emergency rules abrogated the collective bargaining agreement's "for-cause" termination provisions. Terminations pursuant to RIFs are not terminations "for cause." Teachers fired for reasons other than the abolition of their positions in the 1996 RIF continue to have full access to for-cause termination procedures.

### III

We next turn to the Union's argument that the emergency regulations violated the Fifth Amendment's Due Process Clause. In so arguing, the Union acknowledges that RIF"d teachers have available several avenues for challenging their removals in post-termination hearings if they believe either that their terminations were discriminatory or retaliatory, or that notice and separation procedures were not followed. *See supra* p. 777. Counsel for the Union told us at oral argument that many teachers are indeed pursuing these procedures. The Union argues that in addition to post-termination procedures, due process required pre-termination hearings. Although the Union's briefs do not propose any particular type of proceeding, counsel conceded at oral argument that nothing in due process law required the District to provide an evidentiary hearing before a neutral arbiter prior to termination, but only "an opportunity to present reasons ... why the proposed action should not be taken." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985); *see also Mathews v. Eldridge*, 424 U.S. 319, 343, 96 S.Ct. 893, 907, 47 L.Ed.2d 18 (1976) ("[S]omething less than an evidentiary hearing is sufficient prior to adverse administrative action."). The Union's position thus boils down to a claim that teachers should have had an opportunity to discuss their CLDF rankings with principals before the rankings became final.

■ We have no doubt that prior to the 1996 RIF, District teachers enjoyed a constitutionally protected property interest in their jobs. *See* D.C.Code Ann. § 1–617.1 (1992 Repl.); *Loudermill*, 470 U.S. at 538, 105 S.Ct. at 1491; *cf. Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). We are less sure whether enactment of the 1996 Budget Act and of the emergency rules extinguished their property interests.

See *American Federation of Government Employees v. OPM,* 821 F.2d 761, 767 (D.C.Cir.1987) ("it is by no means obvious that a property interest ... survive[s] a reduction-in-force"). But we need not resolve that question. Even assuming teachers' property interests survived the 1996 RIF, we think nothing in principles of due process required giving teachers an opportunity to respond to their rankings prior to termination.

       Although due process normally requires pre-termination proceedings of some kind prior to the discharge of employees with constitutionally protected interests in their jobs, *Loudermill,* 470 U.S. at 542, 105 S.Ct. at 1493, post-deprivation hearings suffice in "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *United States v. James Daniel Good Real Property,* 510 U.S. 43, 53, 114 S.Ct. 492, 501, 126 L.Ed.2d 490 (1993) (internal quotation marks and citations omitted); *see also UDC Chairs Chapter, Amer. Ass'n of Univ. Professors v. Board of Trustees,* 56 F.3d 1469, 1473 (D.C.Cir.1995). To determine whether post-deprivation hearings satisfy "minimal requirements of due process," *UDC Chairs,* 56 F.3d at 1473, we balance the three factors set forth in *Mathews v. Eldridge:* the private interest affected by the government's action; the risk of erroneous deprivation of that interest and the likely value of additional safeguards; and the government's interest, including the administrative burdens that additional procedural requirements would impose. *Mathews,* 424 U.S. at 335, 96 S.Ct. at 903; *see also Loudermill,* 470 U.S. at 542–43, 105 S.Ct. at 1493–94.

       In this case, the first factor—the private interest at stake—weighs heavily in favor of requiring pre-termination proceedings. Courts have repeatedly recognized that "the significance of the private interest in retaining employment cannot be gainsaid." *Loudermill,* 470 U.S. at 543, 105 S.Ct. at 1494; *see also Brock v. Roadway Express, Inc.,* 481 U.S. 252, 263, 107 S.Ct. 1740, 1748, 95 L.Ed.2d 239 (1987) (employee's interest in retaining job "substantial"); *Garraghty v. Virginia,* 52 F.3d 1274, 1282 (4th Cir.1995);

*Texas Faculty Ass'n v. University of Texas at Dallas,* 946 F.2d 379, 384 (5th Cir.1991). We also suspect that unlike in the usual RIF, where "the individual characteristics, qualifications or reputations of the [employees] are not at issue," *UDC Chairs,* 56 F.3d at 1474, the 1996 RIF may have carried with it some stigma. Teachers were ranked by their principals, at least in part, on the basis of performance. Among other things, the CLDF required principals to consider teachers' "relevant significant contributions, accomplishments or performance," including "student outcomes, ratings, awards, special contributions, etc.," as well as "negative factors such as disciplinary, attendance and failure to meet professional responsibilities, etc." Daugherty Decl., Ex. 4.

Weighing against requiring pre-termination proceedings are the two remaining *Mathews* factors. The "risk of an erroneous deprivation" of teachers' interests in their jobs is minimal. *Mathews,* 424 U.S. at 335, 96 S.Ct. at 903. Aside from the objective question of the length of service and the statutory requirement to add five years for District residents, school principals have total discretion to rank their teachers. By alluding to the "subjective and individualized nature" of principals' evaluations, appellants' counsel admitted as much at oral argument. Although the Union suggests that factual errors, such as attributing disciplinary proceedings to the wrong teachers, could produce erroneous scores on ranking forms, the record contains no evidence showing that such errors have occurred, much less that the risk of such errors is significant. "[P]rocedural due process rules are shaped by the risk of error inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions." *Id.* at 344, 96 S.Ct. at 907. Because principals enjoyed near-total discretion in ranking their teachers and because the record contains no evidence that factual errors occurred, we also doubt the "probable value" of giving teachers an opportunity to respond to principals' CLDF rankings. *Id.* at 335, 96 S.Ct. at 903. Challenges to ranking decisions, pitting teachers' interpretations of their worth against principals' evaluations, are not likely to be resolved in

the type of summary pre-termination proceedings the Union seeks.

Our analysis of the third *Mathews* factor, the District's interest and the burden that requiring pre-termination proceedings would impose, turns largely on sheer numbers. Over 400 teachers lost their jobs in the 1996 RIF. Although the Union does not demand full-blown evidentiary hearings, giving over 400 teachers time to respond to their ranking forms and requiring principals to answer each would have slowed the RIF process considerably, both delaying and reducing the financial savings the District so desperately needed. *See* Appellees' Br. at 26; *cf. UDC Chairs*, 56 F.3d at 1474; *see also Mayfield v. Kelly*, 801 F.Supp. 795, 798 (D.D.C.1992) (District's "interests weigh differently in a RIF than they do in a removal for cause.... A RIF involves a large number of employees ... for whom it is impossible to have pre-termination hearings.").

Balancing the *Mathews* factors and taking account of the availability of post-termination relief, we hold that due process did not require pre-termination proceedings before the 1996 RIF. The District's need to cut expenditures quickly and efficiently outweighed teachers' interests, especially in light of the minimal risk of error in the ranking process and the questionable value of pre-termination proceedings.

## IV

■ The Union's remaining arguments require little discussion. Claiming that the emergency rules allowed individual principals to make subjective, virtually unreviewable decisions in ranking and RIF"ing their teachers, the Union argues that the rules violated teachers' substantive due process rights. Substantive due process "prevents governmental power from being used for purposes of oppression, or abuse of government power that shocks the conscience, or action that is legally irrational [in that] it is not sufficiently keyed to any legitimate state interests." *Committee of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 943–44 (D.C.Cir.1988) (internal quotation marks and citations omitted); *see also Tri County Indus., Inc. v. District of*

*Columbia*, 104 F.3d 455, 459 (D.C.Cir.1997) ("our circuit requires [a] plaintiff [asserting a substantive due process claim] to show 'grave unfairness' by state (or District) officials") (quoting *Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C.Cir.1988)). We think the Union has fallen far short of meeting its burden of demonstrating "no rational connection" between the Board's action and the interests the Board asserts. *Harrah Indep. Sch. Dist. v. Martin*, 440 U.S. 194, 198, 99 S.Ct. 1062, 1064, 59 L.Ed.2d 248 (1979). In keeping with its "school-based" management system, the Board gave individual schools autonomy in the RIF process by allowing principals to rank their own teachers. *See, e.g.*, Appellees' Br. at 26; Defs.' Reply to Pls.' Opp'n to Defs.' Mot. for Summ. J., Ex. 2. While people might disagree about the extent to which the Board shifted authority to its principals, no one could reasonably suggest that the emergency rules were irrational, or that they "shock[ed] the conscience" or were "used for purposes of oppression." *See Committee of United States Citizens*, 859 F.2d at 943–44 (internal quotation marks and citations omitted).

■ We also disagree with the Union's argument that the emergency rules violated the Home Rule Act, D.C.CODE ANN. § 1–242(3) (1992 Repl.). According to the Union, the emergency rules reduced personnel benefits below the floor guaranteed by the Home Rule Act to federal employees transitioning to District employment in 1980. But as we have pointed out, the Financial Responsibility Act, specifically amending the Home Rule Act, provides that "nothing in [it] shall prohibit the District from separating an ... employee ... in the implementation of a financial plan and budget for the District government approved under [the Financial Responsibility Act]." D.C.CODE ANN. § 1–242(3) (1996 Supp.). Because the emergency regulations "implement[ed]" the 1996 Budget Act, they were expressly authorized by the amended Home Rule Act, even though they may have divested long-time school system employees of personnel benefits protected by the original Home Rule Act. Moreover, section 1–625.5(c), contained in the 1996 Budget Act, specifically provides that "any District

government employee, *regardless of date of hire,* who encumbers a position identified for abolishment shall be separated without competition or assignment rights...." D.C.CODE ANN. § 1–625.5(c) (1996 Supp.) (emphasis added). Although the Union asserts that this provision did not eliminate seniority rights under the Home Rule Act, the statute clearly states otherwise.

The Union argues finally that section 1–625.5 itself required the Board to conduct the 1996 RIF according to system-wide seniority. Subsection (c) of section 1–625.5 required separation of employees "without competition or assignment rights, except as provided in this section," while subsection (d) permitted an affected employee "one round of lateral competition pursuant to Chapter 24 of the District of Columbia Personnel Manual." D.C.CODE ANN.§§ 1–625.5(c)–(d). Chapter 24, like the pre-May 1996 regulations applicable to District teachers, does indeed require seniority-based RIFs. *See supra* pp. 775–76; D.C. Personnel Regs. ch. 24, §§ 2410, 2415–18 (1993). By its terms, however, Chapter 24 does not apply to teachers. D.C. Personnel Regs. ch. 24, § 2402.1 ("This chapter does not cover employees in the Educational Service."). If, as the Union argues, section 1–625.5(d) made Chapter 24 applicable to teachers, we do not understand why, in view of subsection (c)'s requirement that employees occupying abolished positions be "separated without competition or assignment rights *except as provided in this section,*" the School Board nonetheless enacted its own, seemingly conflicting set of emergency rules. To the extent section 1–625.5(d) conflicts with Chapter 24, however, federal courts are not the appropriate forum for resolving the conflict. Section 1–625.5(g)(2) of the D.C.Code provides that "[a]n employee may file with the Office of Employee Appeals an appeal contesting that the separation procedures of subsection[ ] (d) ... were not properly applied." D.C.CODE ANN. § 1–625.5(g)(2). Decisions of the Office of Employee Appeals are appealable to the Superior Court of the District of Columbia. *Id.* § 1–606.3(d) (1992 Repl.).

We affirm the decision of the district court. *So ordered.*