# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 12, 2005 Decided October 28, 2005
Reissued December 22, 2005

No. 04-7106

JAMES A. THOMPSON, JR.,
APPELLANT

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 97cv01015)

*Ellen K. Renaud* argued the cause for appellant. On the briefs was *Richard L. Swick*.

*William J. Earl*, Assistant Attorney General, Office of Attorney General for the District of Columbia, argued the cause for appellee. With him on the brief were *Robert J. Spagnoletti*, Attorney General, and *Edward E. Schwab*, Deputy Attorney General.

Before: EDWARDS, TATEL, and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

2

Concurring opinion filed by *Circuit Judge* EDWARDS.

TATEL, *Circuit Judge*:   The District of Columbia Lottery Control Board fired appellant, a career auditor, after more than ten years of service.  Troubled by the Board's treatment of him, appellant sued, alleging (1) that the Board fired him because he engaged in First Amendment-protected activity, (2) that the Board failed to afford him a hearing as required by the Fifth Amendment's Due Process Clause, and (3) that Board supervisors acted in a manner sufficiently outrageous to constitute intentional infliction of emotional distress.  Finding that the district court improperly dismissed appellant's First and Fifth Amendment claims on the pleadings, we reverse and remand for further proceedings on those claims.  And given that appellant conceded at oral argument that the district court lacked subject matter jurisdiction to resolve his intentional infliction of emotional distress claims against the Board and the District of Columbia, we vacate the judgment on those claims and remand with instructions to dismiss for lack of jurisdiction.

**I.**

As we must in reviewing a judgment on the pleadings, we view the complaint's allegations in the light most favorable to the plaintiff.  *Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1485 (D.C. Cir. 1992).

Appellant James A. Thompson Jr. began working for the District of Columbia Lottery Control Board ("the Board") as an auditor in 1985.  Moving up through the ranks over the next few years, he became Chief of Security in 1988.  In January 1994, after a series of events not at issue in this appeal, the Board reassigned him to the Audit Division.

In the course of his work as an auditor, Thompson made several allegations of fraud and misconduct against the Board's

on-line contractor, Lottery Technology Enterprise (LTE), and LTE's subcontractor G-TECH. His supervisors repeatedly disparaged his reports and discouraged him from continuing his investigations. Undeterred, Thompson pressed on. Of particular note for this appeal, in a February 1996 memorandum to then-Acting Executive Director Dorothy Wade, Thompson alleged that LTE and G-TECH had retained some surplus computer equipment without paying for it. Several months later, in July, Wade gave Thompson an adverse performance evaluation, which Thompson viewed as retaliation for his allegations.

Also in July, Board Director Frederick King transferred Thompson to King's "new security program." The very next day, King informed Thompson that a reduction in force (RIF) would eliminate Thompson's new position effective September 28. That same day, King and the Board's General Counsel told Thompson they were placing him on administrative leave until September 18 because, they said, he "needed time to think."

Thompson returned to work on September 18, and on September 28, the day the RIF was scheduled to become effective, the personnel office told him to return to work as if the RIF had no effect on him. Two days later, the Board gave Thompson a temporary assignment, and he continued working until December 18, at which point he left on sick leave followed by "Use or Lose Annual Leave." The leave period lasted through January 7, 1997, at which point Thompson informed King that for medical reasons he could not return to work. On February 26, Thompson received a personnel action form advising him that his temporary appointment had expired on January 29.

Thus out of work, Thompson filed suit in the U.S. District Court for the District of Columbia, bringing numerous claims against the Board and his individual supervisors. Thompson

later agreed to dismiss several claims in exchange for defendants' agreement not to seek summary judgment, leaving three claims before the district court: retaliation against Thompson on the basis of protected speech, failure to provide him with due process before terminating him, and intentional infliction of emotional distress. Defendants moved for judgment on the pleadings, and the district court granted the motion on all three counts. *Thompson v. District of Columbia*, No. 97-1015 (D.D.C. June 23, 2004); Fed. R. Civ. P. 12(c).

Thompson now appeals. Our review is de novo. *Peters*, 966 F.2d at 1485.

## II.

By becoming a public employee, Thompson did not relinquish his First Amendment right to "comment on matters of public interest." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). Nor did he sacrifice his right to bring a First Amendment claim by deciding "to communicate privately with his employer rather than to spread his views before the public." *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415-16 (1979).

In evaluating Thompson's First Amendment claim, we engage in a four-element inquiry. *O'Donnell v. Barry*, 148 F.3d 1126, 1133 (D.C. Cir. 1998). We ask: (1) whether Thompson spoke on "a matter of public concern"; (2) whether the governmental interest in "promoting the efficiency of the public services it performs through its employees" outweighs Thompson's "interest, as a citizen, in commenting upon matters of public concern, and the interest of potential audiences in hearing what [he] has to say"; (3) whether Thompson has demonstrated that his "speech was a substantial or motivating factor in prompting the retaliatory or punitive act"; and (4) whether the Board has demonstrated that, even without the

protected speech, "it would have reached the same decision." *Id.* (internal citations and quotation marks omitted). The first two inquiries are questions of law, while the last two are questions of fact usually left to the jury. *Id.*

The Board concedes that Thompson spoke on a matter of public concern (element one). Moreover, the Board neither disputes that Thompson's complaint alleges sufficient facts for a jury to conclude that his "speech was a substantial or motivating factor" in adverse actions taken against him (element three) nor argues that "it would have reached the same decision" even without the protected speech (element four). Finally, the Board nowhere claims that purely job-related speech loses all First Amendment protection. *See Garcetti v. Ceballos*, No. 04-473, ___ S. Ct. ___ (Feb. 28, 2005) (granting cert. on this question), *granting cert. to* 361 F.3d 1168 (9th Cir. 2004). To be sure, it asserts that Thompson's allegedly protected speech occurred during the performance of his job duties, but it does so only in the context of emphasizing the strength of the employer's interest. Appellees' Br. 24. This case therefore hinges on element two, requiring that we balance the government's interests against those of Thompson and his "potential audiences."

The district court concluded as a matter of law that the government's "interest in maintaining an efficient workplace in which subordinate employees do not threaten relationships with important contractors and do not routinely disobey their superiors" outweighed Thompson's First Amendment rights. *Thompson*, No. 97-1015, slip op. at 7 (D.D.C. June 23, 2004). The district court erred in drawing that conclusion from this limited record. As we have held, the balancing test calls for a fact-intensive inquiry: "When confronted with firings that implicate a public employee's First Amendment rights, the courts are required to conduct an individualized and searching

review of the factors asserted by the employer to justify the discharge." *Tygrett v. Barry*, 627 F.2d 1279, 1282-83 (D.C. Cir. 1980). The district court could not conduct this "searching review" based on this record, nor can we. Consisting only of the complaint, the record contains no evidence regarding the extent of Thompson's alleged disruptiveness.

To be sure, in its appellate brief the Board suggests that Thompson's inquiries were "unduly disruptive of the agency's overall mission and its relationship with essential contractors." Appellees' Br. 24. But the Board, whose agreement to forbear seeking summary judgment limits our review to the complaint, points to nothing in that pleading to support its claim. Indeed, the Board's insistence that a RIF—rather than anything Thompson did—motivated his dismissal undermines its contention that the need to end Thompson's disruptive behavior outweighs the First Amendment interests at stake here. *See Tygrett*, 627 F.2d at 1286 (requiring court to focus review on reasons given by employer at time of discharge). If Thompson behaved so badly, why didn't the Board terminate him for cause?

Also, Thompson's allegation that LTE and G-TECH engaged in improper practices, which we must accept as true at this stage of the proceedings, indicates that he had good reason to "threaten relationships" with them. Indeed, the unquestioning obedience that the Board appears to demand seems a poor attribute for an employee in Thompson's position; to the contrary, we would have thought that to be diligent, auditors must ask difficult questions and conduct penetrating investigations. *Cf. Hall v. Ford*, 856 F.2d 255, 264-65 (D.C. Cir. 1988) (affirming dismissal for failure to state a claim where plaintiff was high-level policy employee whose job required "loyalty at the expense of unfettered speech" (internal quotation marks omitted)).

In short, not only does Thompson's complaint allege a First Amendment violation, but nothing in it corroborates the Board's version of the story. The Board cannot prevail in a balancing test with no record evidence on its side of the scale.

Nothing in *Koch v. City of Hutchinson*, 847 F.2d 1436 (10th Cir. 1988) (en banc), upon which the Board relies, convinces us to the contrary. There, the Tenth Circuit determined that the City, which had terminated a Fire Marshal for submitting a faulty report, had not violated the First Amendment. *Id.* at 1437-39. *Koch* differs from this case in two significant respects. First, the Tenth Circuit reviewed a judgment n.o.v., so it performed its balancing test with the benefit of a complete factual record. *Id.* at 1439. Second, much of the deterioration in the Fire Marshal's relationship with his co-workers resulted from their losing confidence in him—a loss of confidence which the court found fully supported in the record. *Id.* at 1450-51. Here, by contrast, the Board has offered no evidence that Thompson performed poorly.

Accordingly, we will reverse the judgment on Thompson's First Amendment claim and remand for the district court to develop a record sufficient to allow the "individualized and searching review" required by our case law.

### III.

We turn next to Thompson's Fifth Amendment claim. The Board concedes, as it must, that as a career employee Thompson had a significant interest in continued employment, and that "due process normally requires pre-termination proceedings of some kind prior to the discharge." *Wash. Teachers' Union Local #6 v. Bd. of Educ.*, 109 F.3d 774, 780 (D.C. Cir. 1997) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985)). The Board does not argue that it afforded Thompson a pre-termination hearing. Instead, it claims that this case

presents one of the "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *Id.* (quoting *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993) (internal citations and quotation marks omitted in *Wash. Teachers' Union*)).

For its "valid governmental interest," the Board cites the financial distress in which the District of Columbia found itself around the time the Board fired Thompson—financial distress that led to legislation giving District government agency heads absolute discretion "to identify positions for abolishment." D.C. Code § 1-625.5(a) (1996 Supp.). The Board argues that because it terminated Thompson in a RIF for financial reasons, nothing it could have learned from a hearing would have changed its mind.

The Board cites *Washington Teachers' Union* for the proposition that "the concept of procedural due process did not require pre-deprivation hearings before execution of the 1996 modified RIFs." Appellees' Br. 29. Thompson, however, unlike plaintiffs in *Washington Teachers' Union*, contests the assertion that a RIF caused his discharge. As we have explained, moreover, "[w]ere we to look no further than the *stated* reason for an employee's separation, not only could an agency cavalierly discharge [employees] under the guise of a 'reduction-in-force' but under that type of action it could also deprive them of all adverse action procedural rights." *Fitzgerald v. Hampton*, 467 F.2d 755, 758-59 (D.C. Cir. 1972). If the complaint in this case permits an inference that the RIF did not cause Thompson's discharge, granting judgment on the pleadings would constitute precisely what *Fitzgerald* forbids: "look[ing] no further than the *stated* reason."

In this case, the complaint's allegations provide ample justification for questioning the Board's stated reason. According to the complaint, King transferred Thompson to a new position one day and announced the RIF eliminating that position the next. The sparse record before us reveals no justification for moving Thompson into the doomed position, even if the District's financial distress justified abolishing it. *See Levitt v. D.C. Office of Employee Appeals*, 869 A.2d 364, 366 (D.C. 2005) (refusing to accept District's characterization as RIF where employee was transferred to newly created position which was abolished a few weeks later). Moreover, nothing in the record indicates that the Board abolished the permanent position Thompson had held before the transfer to his short-lived new post.

Reductions in force are about terminating positions, not people. If, on remand, the district court determines that the Board sought to terminate *Thompson* rather than Thompson's *position*—either as retaliation for First Amendment-protected activity or for some other reason—then the Board's argument that RIFs require no pre-termination hearings becomes irrelevant. And once again, the Board finds itself in an awkward litigating position: Its claim that Thompson caused problems sufficient to outweigh his First Amendment rights undermines its contention that the Board targeted Thompson's position rather than Thompson himself.

As we cannot determine on the basis of the complaint alone whether the Board had a governmental interest that justified depriving Thompson of a pre-termination hearing, we will reverse the judgment on the Fifth Amendment claim and remand for further proceedings consistent with this opinion.

10

**IV.**

This brings us finally to Thompson's intentional infliction of emotional distress claim. The Board argues, as it did in the district court, that the Comprehensive Merit Personnel Act (CMPA), D.C. Code tit. 1, ch. 6, preempts this claim. At oral argument, Thompson conceded that the CMPA strips the court of jurisdiction over his claims against both the Board and the District of Columbia. *See Robinson v. District of Columbia*, 748 A.2d 409, 411 n.4 (D.C. 2000) (holding that CMPA preemption is jurisdictional). We will therefore vacate the judgment on those claims and remand with instructions to dismiss for lack of subject matter jurisdiction. *See Utility Air Regulatory Group v. EPA*, 320 F.3d 272, 277 (D.C. Cir. 2003) (requiring resolution of jurisdictional issues before turning to the merits).

As to the two individuals Thompson also sued, Thompson's appellate brief describes them as "not party to appeal," Appellant's Br. at i, and Thompson never served them, *see id.* at 33. Thus, neither the merits of those claims nor the question whether the district court had subject matter jurisdiction over them is before us.

**V.**

Because the complaint's allegations suffice to state both First and Fifth Amendment claims, we reverse the judgments on those claims and remand for further proceedings consistent with this opinion. And because the district court lacked subject matter jurisdiction over the common-law claims against the District and the Board, we vacate the judgment on those claims and remand with instructions to dismiss for lack of subject matter jurisdiction.

*So ordered.*

Edwards, *Circuit Judge, concurring*: I agree with the majority that this case must be remanded to the District Court for proper consideration of Mr. Thompson's First Amendment claim. I also agree that we lack subject matter jurisdiction over Thompson's intentional infliction of emotional distress claims against the District of Columbia Lottery Control Board and the District of Columbia. I write separately, however, to express some concerns over Thompson's Fifth Amendment claim, which rests on his allegation that he was denied procedural due process when the Board eliminated his position through a reduction in force ("RIF") without first affording him proper notice and hearing. Thompson's due process claim raises some challenging issues that do not admit of simple resolution. I think these issues require amplification so that the parties do not go astray in their arguments when the case is heard again by the District Court.

* * * *

The first point that should be emphasized is that the District Court may not need to reach Thompson's due process claim. The core of Thompson's complaint is his allegation that the Board retaliated against him for engaging in protected speech. In other words, Thompson charges that his job was eliminated and he was fired because he leveled charges of fraud and misconduct against contractors who had been retained by the Board. If the District Court finds that Thompson's speech was a matter of public concern, that the governmental interests in efficient Board operations did not outweigh Thompson's interests as a citizen in commenting on matters of public concern, that Thompson's speech was a substantial or motivating factor in the Board's retaliation against him, and that the Board would not have taken the same action absent Thompson's protected speech, then Thompson will have had a full and fair hearing on his core complaint and he will secure all the relief that he seeks in this law suit. No good purpose will be served for the District Court to decide whether Thompson was also denied procedural due process when he was terminated

without a hearing if the trial court determines that Thompson is entitled to relief on his First Amendment claim.

Indeed, given the posture of this case, it would appear that the disposition of the First Amendment claim may dispose of the entire case. If Thompson wins on his First Amendment claim, there is no good reason to address his Fifth Amendment claim. If he loses on his First Amendment claim that the RIF was a pretext, it is hard to fathom what he will gain – in real terms – from an order saying that he was entitled to notice and an opportunity to discuss the RIF with his superiors before he was terminated. No matter. Thompson's complaint frames his due process claim independently of the alleged First Amendment violation, arguing that his status as a "career service employee" entitled him to due process before being terminated. I therefore accept the majority's conclusion that Thompson's Fifth Amendment claim must be addressed if he loses on his First Amendment claim, on the assumption that he may have been denied proper notice and an opportunity to be heard before his job was eliminated by RIF.

\* \* \* \*

It is far from clear that Thompson has a viable claim under the Fifth Amendment. I say this without meaning to prejudge the issue. All that I mean to say is that this case poses some baffling questions with respect to Thompson's due process claim. The only thing that is clear at this point is that the matter cannot be resolved on the pleadings or on the vague assertions advanced by the parties in their arguments to this court. Should it become necessary for the District Court to resolve the due process claim, the parties must first develop a coherent record and then endeavor to square the facts in the record with existing case law. This will be no mean feat.

Thompson's claim that he was entitled to pretermination process relies on principles first articulated in *Cleveland Board*

*of Education v. Loudermill*, 470 U.S. 532 (1985). In *Loudermill*, the Court held that a civil service employee who has a right to continued employment has a constitutionally recognized property interest that entitles him to "some kind of hearing" before he is terminated. *Id.* at 542 (internal quotation marks and citation omitted). "The need for some form of pretermination hearing . . . is evident from a balancing of the competing interests at stake. These are the private interest in retaining employment, the governmental interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens, and the risk of an erroneous termination." *Id*. at 542-43 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

The Court made it clear, however, "that the pretermination 'hearing,' though necessary, need not be elaborate." *Loudermill*, 470 U.S. at 545. Generally, a full evidentiary hearing is not required if the affected employees are entitled to a full administrative hearing and judicial review after termination. *Id*. "The essential requirements of due process . . . are notice and an opportunity to respond." *Id*. at 546. "To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." *Id*.

\* \* \* \*

Thompson's dealings with the Lottery Board, at least as he outlines them in his complaint, do not necessarily fit within the compass of *Loudermill*. In order to determine whether Thompson has presented a viable Fifth Amendment claim, the District Court must determine whether Thompson was deprived of a protected property interest, and, if so, whether he received the process he was due. *UDC Chairs Chapter, Am. Ass'n of Univ. Professors v. Bd. of Trustees of the Univ. of the Dist. of Columbia*, 56 F.3d 1469, 1471 (D.C. Cir. 1995) (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982)). The first

inquiry, whether Thompson had a property interest, is a matter of local law. "Property interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" *Loudermill*, 470 U.S. at 538; *see also Bd. of Regents v. Roth*, 408 U.S. 564, 577-78 (1972). The second inquiry has two elements. The District Court must first decide, as a legal matter, what procedures were required, and second, as a factual matter, whether the procedures available to Thompson – if any – met the legal requirement.

\* \* \* \*

In determining whether Thompson had a protected property interest, the District Court will be forced to decide whether to focus on the time before or after Thompson was transferred to the new position that was eliminated by the Board during the purported RIF. If Thompson's earlier position is relevant for assessing his due process entitlements, and if the District Court finds that he was a career service employee subject only to termination for cause, then *Loudermill* suggests that his expectation in continued employment constituted a protected property interest. *See Loudermill*, 470 U.S. at 538-39. On the other hand, if the relevant focal point is Thompson's RIF'd position, it is less clear whether he enjoyed a property right.

At least two decisions issued by this court have suggested that the existence of a property right in a government job – particularly a position eliminated under the auspices of the District's 1996 Budget Act, as Thompson's position ostensibly was – does not survive a fiscally induced layoff. *See Wash. Teachers' Union Local #6 v. Bd. of Educ. of the Dist. of Columbia*, 109 F.3d 774, 779-80 (D.C. Cir. 1997); *Am. Fed'n of Gov't Employees v. Office of Pers. Mgmt.*, 821 F.2d 761, 767 (D.C. Cir. 1987). I suppose that the argument under this line of analysis might be that an employee cannot hold a "property right" tied to a RIF'd position, because a person in a position

slated for a RIF has no reasonable expectation of continued employment. I doubt that the case law of this circuit means to go this far, however. To date, the most that we have said is that "it is by no means obvious that a property interest. . . . survive[s] a reduction-in-force." *Am. Fed'n of Gov't Employees,* 821 F.2d at 767. And in *Washington Teachers' Union*, the court suggested only that "enactment of the 1996 Budget Act and of the emergency rules" *may have* "extinguished [the RIF'd employees'] property interests." 109 F.3d at 779. It would be a mistake to make too much of these decisions.

It is noteworthy that our sister circuits have not shared our doubts about the survival of a property interest after a RIF, especially where the former employee asserts that the RIF was really a subterfuge for firing a particular individual. In *West v. Grand County*, 967 F.2d 362, 367 (10th Cir. 1992), for example, the Tenth Circuit explained that it had "no doubts" that an employee alleging a pretextual RIF maintained her protected property interest, arguing that the very function of a hearing would be to determine whether or not the RIF had been legitimate. Labeling an employee's termination "a 'reduction in force' does not affect her entitlement to a pretermination hearing when she is asserting that the reduction in force was a sham aimed particularly at her." *Id.* at 368. The Seventh Circuit employed similar reasoning in *Lalvani v. Cook County*, 396 F.3d 911 (7th Cir. 2005). The court emphasized that "the mere intonation of the acronym 'RIF'" does not avoid the need for a due process hearing, the very purpose of which is "precisely to find out whether the termination under the auspices of a RIF was permissible or not." *Id.* at 915 (citations and quotations omitted); *see also Whalen v. Mass. Trial Court*, 397 F.3d 19, 26 (1st Cir. 2005) (stating that where "it seems inescapable that [an employee's] job performance" influenced selection for a reorganization layoff, it is fundamental "that *some* process is due"); *Misek v. Chicago*, 783 F.2d 98, 101 (7th Cir. 1986) ("Accordingly, absent good cause, [RIF'd employees] were

improperly dismissed unless on remand it should be determined that their discharge was pursuant to an actual reorganization of the agency.").

This court has yet to determine what process is due when an employee contends that his RIF was a subterfuge. We have merely suggested that the extent of necessary pretermination process may depend upon the number of individuals subject to a RIF. *See Wash. Teachers' Union*, 109 F.3d at 780-81; *UDC Chairs,* 56 F.3d at 1474 ("Where, as here, the deprivation turns on a policy decision and not on an individual's characteristics, a pre-deprivation hearing would do little to reduce the risk of erroneous deprivation of the [employees'] interests."); *see also Whalen*, 397 F.3d at 25 ("[B]ecause reorganizations often affect numerous employees, the governmental interest in efficient administration may weigh more heavily in such circumstances."). It is significant, however, that this court has never rejected the principle enunciated in *West, i.e.,* that an otherwise protected civil service employee alleging a pretextual RIF retains his protected property interest and, thus, may insist on notice and an opportunity to respond. *See West*, 967 F.2d at 367.

In this case, then, the question whether Thompson held a protected property interest in his pre-transfer position will antecede any further analysis. Whether or not a property interest survives a RIF, Thompson will have no entitlement to notice and a hearing of any sort if he never had a property interest in the first place. Moreover, the facts alleged in this case are more complicated than those presented in other circuits' cases dealing with allegedly pretextual RIFs. Whereas those cases dealt with individuals who occupied protected positions slated for elimination, they do not provide insight into how to treat an employee who claims the sham was his transfer from a protected position into a doomed position, not selection of the position to be RIF'd. The District Court must consider this matter on

remand in determining whether Thompson had a protected property right.

\* \* \* \*

If the District Court finds that Thompson had a protected property right, it must next determine what process he was due. It is important to note that courts finding a continued property interest in RIF'd positions have demanded only the most skeletal pretermination process. "The standards for a pretermination hearing are not stringent because of the expectation that a more formal post-termination hearing will remedy any resulting deficiencies." *Id*. Following the Court's holding in *Loudermill*, *see* 470 U.S. at 546, the *West* court noted that a "full evidentiary hearing is not required," but rather, "notice and an opportunity to respond" suffices to meet the employer's due process burden. *West*, 967 F.2d at 367. The court therefore held that the plaintiff's opportunity to "discuss her potential termination" with superiors represented adequate pretermination process for a RIF'd employee, especially where the employee later received a formal grievance hearing before presumptively neutral decisionmakers. *Id.* at 368-69.

While the availability of post-deprivation proceedings may limit how much pretermination process is due, the converse is also true. The Seventh Circuit, for example, acknowledged that "when there is an opportunity for a full post-termination hearing, due process does not require an employer to provide full 'trial-type rights.'" *Baird v. Bd. of Educ. for Warren Comm'ty Unit Sch. Dist. No. 205*, 389 F.3d 685, 690-91 (7th Cir. 2004). But the court further held that "[a] state law breach of contract claim is not an adequate post-termination remedy for a terminated employee who possesses a present entitlement and who has been afforded only a limited pre-termination hearing." *Id.* at 692. To avoid granting substantial pre-deprivation process to an employee with a present entitlement to his job, an employer must provide post-deprivation procedures that "are characterized

by promptness and by the ability to restore the claimant to possession." *Id.*

If the District Court reaches the ultimate question – whether the Lottery Board denied Thompson process that he was due – its answer will depend on a critical examination of what pre-deprivation processes were available to Thompson, and the extent to which their efficacy was bolstered by the promise of more formal proceedings down the road. The inquiry will be fact-intensive, focusing on whether Thompson received notice of his precarious employment situation; whether he conferred with superiors about his status; and, if he did not confer with his superiors, whether he had the opportunity to do so.

These threshold questions are important, because, at least based on the pleadings, it is impossible to tell precisely how much "notice" Thompson received in advance of his job moves and ultimate termination, and whether he talked with his superiors about his situation. Indeed, it is unclear whether Thompson even contends that he was foreclosed from contesting his transfer to the job that was eliminated. It may be that Thompson was unaware that the job into which he was transferred was unprotected, but that remains to be determined.

In answering these questions, the District Court will also need to ascertain exactly what post-deprivation procedures were available to Thompson. For example, it appears that, at the time of the events giving rise to this law suit, employees alleging retaliatory RIFs could "institute a civil action in the Superior Court," which could impose injunctive or monetary remedies. D.C. CODE. § 1-616.3(c) (1998 Repl.). An action initiated under that provision would "[o]perate as an exhaustion of the employee's administrative remedies" and "[c]onstitute the employee's exclusive remedy under the laws of the District." *Id*. § 1-616.3(e). It is unclear whether Thompson qualified for these procedures – or, alternatively, whether a comparable provision applied – and whether he had access to whatever

procedures were available. It is also unclear whether the procedures statutorily accorded to Thompson contained adequate safeguards to buttress whatever less formal notice-and-hearing opportunities were available to him before his termination.

\* \* \* \*

There is reason to believe that the District Court's resolution of Thompson's First Amendment claim will dispose of this case. That will be fortunate indeed, because the Fifth Amendment claim raises some perplexing questions that will not be easily resolved, especially on a spare and confusing record like the one that is now before the court.